**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FRANKIE L. WEBB, JR.,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **1:14-cv-00250-TFM** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **ACTING COMMISSIONER OF** | ) |
| **SOCIAL SECURITY,** | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION**

May 20, 2015

**I.      Introduction**

Frankie L. Webb, Jr., ("Plaintiff") brought this action for judicial review of the decision of the Acting Commissioner of Social Security, which denied his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403. Pending before the Court are the parties' cross-motions for summary judgment (ECF Nos. 7, 9). The motions have been fully briefed and are ripe for disposition (ECF Nos. 8, 10).

**II.      Background**

**A.      Facts**

Plaintiff was born on February 4, 1969, making him a "younger person" under the regulations as of his alleged onset date.[1] (R. 47). He graduated from high school and thereafter joined the United States Army. (R. 47-48). He served on active duty in Kuwait and Iraq in 2003 and eventually retired from the Army in September 2009 for medical reasons. (R. 48-51). Specifically, he was missing "on average one to maybe two days a week" because he was

---

1.      If a claimant is under age 50, the Social Security Administration "generally do[es] not consider that [his] age will seriously affect [his] ability to adjust to other work." 20 C.F.R. § 404.1563(c).

1

"getting sick" and his "sugar readings from the diabetes were really high." (R. 50-51). He also had trouble gripping things with his hands, which, during the hearing, he attributed to "arthritis." (R. 50-52). He has not worked since 2009 and receives disability benefits from the Department of Veterans Affairs ("VA"). (R. 48).

In his initial application for benefits, Plaintiff alleged disability as of August 31, 2009, due to fibromyalgia, hypertension, sleep apnea, diabetes, nonalcoholic steatohepatitis (fatty liver disease), a torn left Achilles, tendonitis in his right Achilles, bilateral hearing loss, tinnitus, and gastroesophageal reflux disease ("GERD"). (R. 94, 154-55, 172). After his claim was denied at the administrative level, Plaintiff filed a supplemental disability report in which he claimed to be suffering from post-traumatic stress disorder ("PTSD"). (R. 194).

### 1. Veterans Affairs Medical Center Records

Plaintiff has treated at the VA Medical Center ("VAMC") in Erie, Pennsylvania, since his retirement. On July 31, 2009, Lawrence Galla, M.D., conducted compensation and pension examination ("C&P exam") in connection with Plaintiff's VA disability claim. (R. 318). Dr. Galla reviewed Plaintiff's "myriad of claims" and confirmed that he had previously been diagnosed with fatty liver, GERD (well controlled on Nexium), sleep apnea (treated with a continuous positive airway pressure ("CPAP") machine), diabetes mellitus, residual right leg burn with erythema, hyperlipidemia, and kidney stones. (R. 322-25). On August 20, 2009, Plaintiff underwent another C&P exam, this time with Michael Orinick, M.D. (R. 327). Plaintiff complained of a variety of musculoskeletal ailments and pain, along with trouble sleeping, stiffness, paresthesia, and irritable bowel syndrome. (R. 331). Although a physical examination was unremarkable, Plaintiff had "at least 16 and possibly 18 tender points consistent with a diagnosis of fibromyalgia . . . ." (R. 332). According to Dr. Orinick, Plaintiff's problems were

"difficult to diagnose due to the diffuse nature of the pain with palpation and diffuse range of motion problems, without overt objective findings suggestive of any specific pathology in any of these areas." (R. 334). Still, he explained that "most if not all of [Plaintiff's] complaints are due to fibromyalgia." (R. 334).

Plaintiff visited the Erie Vet Center on September 28, 2011, to undergo Vocational Rehabilitation orientation and fill out paperwork. (R. 441). Afterward, Jane Drumm, a licensed clinical social worker, called Plaintiff to tell him about the counseling services offered by the Vet Center. (R. 441). In response to questioning from Ms. Drumm, Plaintiff described his readjustment to civilian life as good, and he declined Ms. Drumm's offer of counseling. (R. 441). After the conversation, Ms. Drumm noted that Plaintiff "sounded positive" and hoped to attend school and find a job in the civilian workforce. (R. 441).

In March 2012, Mary Ann Kozlowski, M.D., of the VAMC performed another C&P exam and also completed a VA Disability Benefits Questionnaire, in which she assessed each of Plaintiff's alleged impairments, including his fibromyalgia. (R. 227-307). In terms of symptoms, Plaintiff reported experiencing stiffness, muscle weakness, fatigue, sleep disturbances, paresthesia, headaches, and irritable bowel syndrome. (R. 273, 275). He also described having dreams of a military nature and experiencing numbness in his hands, forearms, elbows, and legs. (R. 273). As for treatment, Plaintiff took five ibuprofens a day, which he said helped to alleviate his pain. (R. 273). In the Disability Benefits Questionnaire, Dr. Kozlowski checked a box indicating that Plaintiff's fibromyalgia impacted his ability to work. (R. 275). As she explained, Plaintiff told her that "[h]e can sit at the computer for 20-30 minutes before he has to get up and walk about for several miutes [sic] and if they do not loosen up he has to go and lay down." (R. 275). Thus, she continued, "[t]his would preclude gainful employment in a physical or a

sedentary job." (R. 275).

In October 2012, Plaintiff saw Andrew King, M.D., his primary care physician at the VAMC, and reported that his condition was about the same as it had been. (R. 369). He did, however, describe suffering from recurrent neck and upper back soreness, but noted that the soreness usually worked itself out over the course of the day. (R. 369). He also reported experiencing some arthralgia (joint pain), myalgia (muscle pain), and constipation, but denied experiencing any additional symptoms, including fatigue, memory loss, paresthesia, weakness, depression, anxiety, and thoughts of hurting himself and others. (R. 371). Dr. King confirmed diagnoses of hypertension, diabetes mellitus, osteoarthritis, hyperlipidemia, GERD, elevated liver enzymes, and sleep apnea, but he made no mention of fibromyalgia. (R. 371). According to Dr. King, Plaintiff's diabetes was poorly controlled, his blood pressure was slightly elevated, his lipids were high, his GERD was stable, his degenerative joint disease was stable with only occasional reported aches, and his weight was down slightly. (R. 371-72). Because of Plaintiff's high blood sugars and elevated blood pressure and lipids, Dr. King "discussed at length" the need for exercise, weight loss, and lifestyle changes. (R. 369). He also administered depression and PTSD screenings, both of which were negative. (R. 375-76).

Plaintiff followed up with Dr. King on April 18, 2013, with reports that he had recently strained a rib while playing basketball with his son. (R. 354). In addition to the rib pain, Plaintiff said that he had not been checking his blood-sugar levels, and, although his weight was down slightly, he had been non-compliant with his diet. (R. 354). At the same time, his sleep apnea was reportedly "OK w/ CPAP," and he denied any new cardiac, pulmonary, gastrointestinal, skin, or neurological symptoms. (R. 354). He also denied fatigue, memory loss, paresthesia, weakness, depression, anxiety, and thoughts of hurting himself and others. (R. 357). Dr. King

4

determined that Plaintiff's diabetes was even more uncontrolled than it had been during their last visit, and urged Plaintiff to comply with his diet and make the lifestyle changes that had previously been discussed. (R. 357). Meanwhile, Dr. King found that Plaintiff's hypertension, GERD, "DJD/fibromyalgia," and elevated liver enzymes were stable. (R. 357). Finally, Plaintiff tested negative for depression and PTSD, as he had done during his last visit. (R. 359).

Dr. King next saw Plaintiff on October 22, 2013, when he noted that Plaintiff was "generally doing well[.]" (R. 417). Plaintiff reported feeling some fatigue after eating lunch, which were apparently attributed to his diabetes, and a few arthralgias, but he denied experiencing any other symptoms, including memory loss, paresthesia, weakness, depression, anxiety, and thoughts of hurting himself or others. (R. 418-19). Depression and PTSD screenings were once again negative. (R. 422-23). Moreover, just like in April 2013, Dr. King did not record any notes regarding Plaintiff's fibromyalgia. According to Dr. King, Plaintiff's hypertension, GERD, and sleep apnea were stable, but his sugar levels remained elevated. (R. 421). As a result, Dr. King recommended starting Plaintiff on insulin, which he began taking the next month. (R. 421, 490, 492, 493). Dr. King also continued to urge Plaintiff to diet and exercise. (R. 421).

On December 13, 2013, Plaintiff contacted Dr. King's office through the VA's web-based secured messaging system to request a prescription for fibromyalgia. (R. 487). Dr. King prescribed Plaintiff cyclobenzaprine, a muscle relaxant. (R. 487). That same date, Plaintiff requested a referral to be evaluated for PTSD, explaining that he was waking up with "bad dreams/night sweats" and that fellow veterans had told him to seek help. (R. 486). Dr. King obliged. (R. 486). Plaintiff testified that, before he reached out to Dr. King, he "sort of kept" his symptoms of PTSD "away from the VA" because he "wasn't proud of having it." (R. 66).

A few days later, Plaintiff underwent a Gulf War Registry physical exam at the VAMC.

(R. 480). He complained of chronic fatigue with night sweats, muscle and joint pain, sleep disturbances, gastrointestinal problems, heartburn, constipation, anxiety, mood swings, paresthesia, and insomnia. (R. 484). But he denied, among other things, memory loss, difficulty concentrating, depression, and combat-related nightmares and flashbacks. (R. 484). Upon examination, Plaintiff had no joint tenderness, warmth, or swelling; no muscle atrophy; a good range of motion; and full muscle strength in his upper and lower body. (R. 485-86).

On December 28, 2013, Plaintiff visited the VAMC to undergo a mental health diagnostic study with Patrick McKinstry, a certified mental health counselor. (R. 466). As he had when he contacted Dr. King for a referral, Plaintiff explained that a friend had advised him to seek treatment after he "lashed-out at some neighborhood children." (R. 468). His friend suggested that he might have PTSD and "encouraged him to approach the VA to become service connected." (R. 468). While he never sought treatment before, he said that he had been experiencing PTSD-like symptoms since "right after 9/11." (R. 468). During the study, Plaintiff reported trouble sleeping, with two to three nightmares a week of a military nature; feelings of nervousness, excessive worry, and muscle tension; and irritability, anhedonia (reduced ability to experience pleasure), feelings of worthlessness, and impaired concentration. (R. 468-69). He also described having anger-management problems and a tendency to isolate himself. (R. 468).

As part of the diagnostic study, Mr. McKinstry conducted a behavioral/mental status inventory, which revealed that Plaintiff was well-oriented, attentive, and appropriately behaved. (R. 473). Likewise, his mood was euthymic (non-depressed), his affect was "mood congruent," his thought processes were normal and congruent, his judgment was good, and he displayed no evidence of hallucinations or illusions. (R. 473). Based on Plaintiff's description of his symptoms, however, Mr. McKinstry diagnosed him with unspecified depressive disorder,

unspecified anxiety disorder, and "r/o PTSD," or rule out PTSD. (R. 474). In the impression/recommendations portion of the inventory, Mr. McKinstry explained that Plaintiff was eager to interact and recognized the problematic nature of his behaviors, but at the same time he displayed a limited desire to enact change. (R. 475). "As the interview progressed," Mr. McKinstry noted, "[Plaintiff] inquired as to when he may be service connected for PTSD. After some discussion, it is apparent that [Plaintiff] thought that was the purpose of interaction . . . ." (R. 475). In response to Plaintiff's queries about becoming service connected, Mr. McKinstry explained to him the "clinical nature" of the visit and described his treatment options. (R. 475). Plaintiff expressed that he was unsure about whether he wanted to undergo treatment[2] and indicated that he intended to approach the eligibility office to schedule a compensation and pension examination, as becoming "service connected" was "his main concern."[3] (R. 475). Nevertheless, Mr. McKinstry noted that Plaintiff did report many symptoms of PTSD, and thus concluded that "[f]urther assessment" would be "prudent." (R. 475).

In January 2014, Plaintiff began seeing Saundra Fulgham, a licensed clinical social worker, for counseling at the Erie Vet Center. (R. 439-40). During the intake assessment, Plaintiff had difficulty discussing traumatic events, but his mood was fair and he was amenable to receiving services. (R. 440). Plaintiff described having experienced difficulty with crowds, panic attacks accompanied by sweating and difficulty breathing two to three times per day, sleep disturbances, nightmares, trust issues, flashbacks, road rage, and a growing lack of patience and tolerance for others. (R. 430). He also complained of excessive fatigue, irritability/aggression,

---

2. At the hearing, Plaintiff explained that he was not receptive to receiving treatment at the time because he was uncomfortable with Mr. McKinstry, who was not himself a veteran. (R. 68).

3. Conversely, Plaintiff testified at the hearing that he was primarily concerned with seeking treatment for PTSD and not becoming service connected. (R. 68).

anxiety, depression, hypervigilance, apathy, affective labiality, and changes in his personality. (R. 432). However, he denied feelings of hopelessness/despair and suicidal/homicidal thoughts. (R. 430-31). Likewise, Ms. Fulgham noted that his appearance was neat, his manner was "[f]riendly, [and] cooperative," his intelligence was above average, he was well-oriented, his memory function was normal, his motor activity was relaxed, and his judgment was good. (R. 432). Following the intake assessment, Plaintiff continued to see Ms. Fulgham every other week throughout early 2014. (R. 70, 513-26). In April 2014, Ms. Fulgham completed a psychosocial assessment, in which she diagnosed Plaintiff with PTSD and recommended further counseling. (R. 511). Her diagnosis was confirmed by Anthony Mancini, Psy.D, who co-signed the assessment form. (R. 511).

On January 24, 2014, Plaintiff presented to the Urgent Care Center at the Erie VAMC with sinusitis. (R. 457). When asked to review his symptoms, he denied experiencing, among other things, night sweats, fatigue, arthralgia, myalgia, memory loss, paresthesia, weakness, depression, anxiety, and thoughts of hurting himself/others. (R. 459).

In April 2014, Dr. King completed a Fibromyalgia Residual Functional Capacity ("RFC") Questionnaire. (R. 531-35). According to Dr. King, Plaintiff satisfied the American College of Rheumatology ("ACR") criteria for fibromyalgia,[4] and his prognosis was "stable." (R. 531-35). Dr. King noted that Plaintiff had multiple tender points, non-restive sleep, chronic fatigue, morning stiffness, muscle weakness, frequent severe headaches, numbness and tingling, breathlessness, anxiety, panic attacks, depression, and chronic fatigue syndrome. (R. 531). When

---

4.      Under the ACR criteria, a person is considered to have fibromyalgia (1) he has a history of widespread pain that has lasted for at least three months, (2) there are at least 11 positive tender points, bilaterally and above and below the waist, and (3) other disorders that could have caused the symptoms have been excluded. Titles II & XVI: Evaluation of Fibromyalgia, SSR 12-2P, 2012 WL 3104869, at *2 (S.S.A. July 25, 2012).

asked how often Plaintiff's pain or other symptoms would interfere with the attention and concentration needed to perform simple work tasks, Dr. King responded, "frequently." (R. 532). Dr. King further indicated that Plaintiff was only capable of low-stress work. (R. 533). In addition, Dr. King opined that Plaintiff could sit for 30 minutes at a time and stand for 20 minutes at a time before needing to get up and could only sit and stand/walk for less than two hours total in a workday. (R. 533). In Dr. King's view, Plaintiff also required a job that would allow shifting positions at will, would sometimes require the use of a cane or other assistive device, and would need to be permitted to take unscheduled, five-to-ten-minute breaks every hour. (R. 533).

With regard to exertional limitations, Dr. King felt that Plaintiff could frequently lift/carry less than 10 pounds, occasionally lift/carry 10 pounds, and rarely lift/carry 20 pounds. (R. 534). He could occasionally twist, climb ladders, and climb stairs, but rarely stoop and crouch; and occasionally look down, turn his head, look up, and hold his head in a static position. (R. 534). Dr. King also opined that Plaintiff had significant limitations in his ability to engage in repetitive reaching, handling, and fingering. (R. 534). Finally, Dr. King opined that Plaintiff would miss more than four days of work per month because of his fibromyalgia. (R. 534).

### 3. State Agency Examinations and Assessments

On September 30, 2013, Plaintiff underwent a physical examination with state agency consultant Charles E. Rohrbach, D.O. (R. 385). Plaintiff presented to Dr. Rohrbach with a "few vague complaints." (R. 387). In particular, he reported having an "exhausting fatigue which is disabling to him" and numbness and tingling in his hands, which, according to Dr. Rohrbach, was apparently related to his diabetes. (R. 387). Plaintiff denied having any other symptoms, including depression, and a physical examination revealed unremarkable findings. (R. 389-91).

Plaintiff did not display any clubbing, cyanosis, or edema; had a full range of motion in all of his extremities; and had full muscle strength. (R. 391). Additionally, Plaintiff was able to ambulate into and out of the exam room, position himself on the exam table, and arise from a chair in the exam room without any difficulty. (R. 391). Following the exam, Dr. Rohrbach completed a medical source statement, in which he opined that Plaintiff could continuously lift/carry up to 50 pounds and occasionally up to 100 pounds; sit and stand for eight hours without interruption and walk for six hours without interruption; continuously reach, handle, finger, feel, and push/pull in both hands; frequently use his feet (despite slight neuropathy); and continuously engage in all postural activities. (R. 397-98). He further opined that Plaintiff could perform activities like shopping, travel without a companion, walk without assistance and at a reasonable pace, use public transportation, climb a few steps at a reasonable pace, prepare simple meals and feed himself, care for his personal hygiene, and sort, handle and use papers and files. (R. 399).

On November 4, 2013, Michael J. Niemiec, a state agency physician, reviewed Plaintiff's file and completed a physical RFC assessment form. (R. 98-100). Dr. Niemiec opined that Plaintiff could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand/walk for about six hours, and sit for about six hours. (R. 99). Dr. Niemiec also opined that Plaintiff was unlimited in his ability to push and/or pull and had no postural, manipulative, visual, communicative, or environmental limitations. (R. 99).

### B.      Procedural History

Plaintiff filed an application for DIB on May 22, 2013. (R. 154-55). His claim was denied at the administrative level, and subsequently he filed a written request for a hearing. A hearing was held on April 29, 2014, before Administrative Law Judge ("ALJ") David F. Brash. (R. 40-93). Plaintiff was represented by counsel and testified at the hearing, as did his wife, Stephanie,

and an impartial vocational expert ("VE"). (R. 40-93).

On June 6, 2014, the ALJ issued a decision denying Plaintiff's claim for benefits. (R. 25). At step one of the sequential evaluation process, the ALJ found that Plaintiff had several "severe" impairments: fibromyalgia, obesity, osteoarthritis, diabetes mellitus with mild neuropathy, obstructive sleep apnea, bilateral sensorineural hearing loss, tinnitus, status post left Achilles tendon tear, right Achilles tendonitis, shin splints, and PTSD. (R. 20). The ALJ also considered Plaintiff's hypertension, residual right leg burn with erythema, GERD, fatty liver disease, nonalcoholic fatty liver disease, sinusitis, deviated septum, kidney stones, depression, and anxiety, but determined that none of these impairments were "severe." (R. 21-22). At the third step, the ALJ found that Plaintiff's impairments did not meet or equal the requirements of any of the Listed Impairments. (R. 24-26). Accordingly, the ALJ proceeded to assess the following RFC assessment for Plaintiff:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: he can never climb a ladder, rope, or scaffold; can never crawl; can only occasionally push, pull, or operate foot controls with the lower extremities; can only occasionally climb ramps and stairs; can only occasionally balance, stoop, kneel, or crouch; must avoid even moderate exposure to temperature extremes, wetness, and humidity; must avoid all exposure to unprotected heights, dangerous machinery, and like workplace hazards; will require a sit-stand option, at the work station, with intervals no more frequent than every thirty minutes; is limited to a moderate noise intensity level work environment, such as that akin to being in the presence of light traffic or in a department or grocery store; is limited to understanding, remembering, and carrying out simple instructions and performing simple, routine tasks; is limited to no work-related contact with the public, only occasional and superficial interaction with co-workers, and no more than occasional supervision; and is limited to a low stress work environment, which means no production rate pace work, but, rather, goal oriented work with only occasional and routine change in work setting.

(R. 26). At step four, the ALJ concluded that Plaintiff could not return to his past relevant work. Finally, at step five, the ALJ concluded that a significant number of jobs existed in the national

economy that Plaintiff could perform based on the VE's responses to his hypothetical questions. (R. 34-35). Thus, the ALJ held that Plaintiff was not disabled within the meaning of the Act. The ALJ's decision became the final decision of the Acting Commissioner on August 13, 2014, when the Appeals Council denied Plaintiff's request for review. (R. 1-4).

## III.    Legal Analysis

### A.    Sequential Evaluation Process

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1). When deciding whether a claimant is disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work that exists in significant numbers in the national economy. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

### B.    Standard of Review

The Act strictly limits the Court's ability to review the Commissioner's final decision. 42 U.S.C. § 405(g). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, the Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358,

360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

### C.     Discussion

Plaintiff raises three arguments in support of his motion for summary judgment.[5] He argues that the ALJ (1) erred in analyzing his allegations of pain and fibromyalgia, as well as the opinion evidence related thereto; (2) erred in finding that his mental impairments (depression, anxiety, and PTSD) were not disabling; and (3) erred in assessing Plaintiff's RFC and his analysis of the VE's testimony. These arguments will be addressed *seriatim*.

### 1.     The ALJ did not err in his analysis of Plaintiff's pain and fibromyalgia.

Plaintiff's first contention is that the ALJ erred in analyzing the effects of his fibromyalgia on his ability to work. According to Plaintiff, "the ALJ's analysis of [his] fibromyalgia rests on mistaken assumptions about the nature of the disease[.]" Pl.'s Br. at 8, ECF No. 8. In particular, Plaintiff maintains that the ALJ placed too much emphasis on the lack of "substantial treatment" and objective findings, swelling, and other orthopedic and neurological

---

5.     Plaintiff has actually raised four separate arguments, but the Court finds it more appropriate to address his arguments as to the ALJ's evaluation of the opinion evidence alongside his argument as to the ALJ's assessment of his fibromyalgia.

deficits, which, in Plaintiff's view, are not relevant factors when considering a claimant with fibromyalgia. Plaintiff also contends that the ALJ erred by interpreting reports that his condition had been "stable" as meaning that his fibromyalgia was not disabling. Finally, Plaintiff faults the ALJ for failing to accord more weight to Dr. King's opinion regarding the effects of his fibromyalgia and to the VA's decision to regard him as disabled.

Fibromyalgia is "a common, but elusive and mysterious, disease[,]" characterized by diffuse musculoskeletal pain, "fatigue, disturbed sleep, [and] stiffness[.]" *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). In evaluating disability claims based on fibromyalgia, courts have acknowledged that symptoms of the disease are entirely subjective and that objective, medical testing is incapable of confirming a diagnosis or assessing the disease's severity. *Id.* "Still, a claimant who has been diagnosed with fibromyalgia will not automatically be classified disabled under the Social Security Act." *Ford v. Astrue*, No. CIV.A. 11-591, 2012 WL 2318983, at *7 (W.D. Pa. June 18, 2012) (citing *Singleton v. Astrue*, 542 F. Supp. 2d 367, 377 (D. Del. 2008)). "Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not[.]" *Sarchet*, 78 F.3d at 306 (citations omitted). "[B]ecause of the subjectivity of the symptoms of fibromyalgia, the credibility of a claimant's testimony" with regard to his symptoms takes on special importance. *Ford*, 2012 WL 2318983, at *7 (citing *Singleton*, 542 F. Supp. 2d at 378). Consequently, "'[e]ven in fibromyalgia cases, the ALJ must compare the objective evidence and the [claimant's] subjective complaints and is permitted to reject plaintiff's subjective testimony so long as he provides a sufficient explanation for doing so.'" *Id.* (quoting *Nocks v. Astrue*, 626 F. Supp. 2d 431, 446 (D. Del. 2009)). When assessing a plaintiff's fibromyalgia-related symptoms, the ALJ may also "consider whether the record reveals clinical documentation of the complainant's symptoms and whether diagnosing

physicians reported on the severity of the condition." *Id.* The Social Security Administration has emphasized this, explaining that in fibromyalgia cases, "longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment." Titles II & XVI: Evaluation of Fibromyalgia, SSR 12-2P, 2012 WL 3104869, at *3 (S.S.A. July 25, 2012). SSR 12-2P goes on to explain that if "objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptom," the ALJ must "consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id.*

In this case, the ALJ found that Plaintiff's fibromyalgia was a "severe" impairment. (R. 20). However, he did not find that Plaintiff's testimony regarding his claimed symptoms to be entirely credible. In particular, the ALJ found that (1) there was no evidence of "substantial treatment" from 2009 through 2012; (2) treatment records from September 2011 did not contain objective findings of musculoskeletal limitations; (3) an examination from January 2013 did not show any swelling, pain, weakness, or paresthesia in Plaintiff's extremities; (4) Dr. King stated in April 2013 that Plaintiff's condition was stable; (5) Plaintiff only reported a few arthralgias and myalgias in April 2013; (6) the consultative examination revealed that Plaintiff had a full range of motion and full muscle strength in his extremities; (7) a December 2013 examination showed that Plaintiff had no joint tenderness or swelling and a good range of motion with full muscle strength; (8) a January 2014 examination was negative for arthralgia, myalgia, and fatigue, and showed that Plaintiff's muscle movement was not limited; and (9) Dr. King reported

that Plaintiff's condition was stable in April 2014. (R. 27-28). The ALJ also discounted Plaintiff's testimony because he found his activities of daily living to be inconsistent "with an individual who is not able to work." (R. 31). Likewise, the ALJ concluded that Plaintiff's overall treatment history – including the fact that he had not treated with a specialist for fibromyalgia – was not consistent with Plaintiff's claim of disabling impairments. (R. 31).

The Court finds that the ALJ provided legally sufficient reasons for finding that Plaintiff's fibromyalgia and the associated pain was not disabling. Although the ALJ did mention the lack of objective findings, he also appropriately considered all of the additional factors identified in SSR 12-2P when assessing the severity of Plaintiff's condition. Namely, he was correct in observing that Plaintiff had not received "substantial treatment" for fibromyalgia throughout the relevant time period. After his diagnosis in 2009, Plaintiff never saw a specialist and treated only sporadically with Dr. King, who, during some visits, failed to even so much as acknowledge that Plaintiff had fibromyalgia. Moreover, in other visits with Dr. King and different doctors at the VAMC, Plaintiff either denied fibromyalgia-related symptoms such as joint and muscle pain and fatigue, or said that his symptoms were stable. All the while, Plaintiff's uncontrolled diabetes, compounded by Plaintiff's poor diet and lack of exercise, seemed to be Dr. King's chief concern – not his fibromyalgia. Accordingly, the ALJ did not err in assessing all of the evidence related to Plaintiff's fibromyalgia and determining that his testimony regarding the severity of that condition was not entirely credible. At any rate, even though the ALJ did not find Plaintiff to be entirely credible and found a lack of supporting medical evidence for his claims, he generously limited him to sedentary, unskilled work, with several other exertional and non-exertional limitations. This decision is supported by substantial evidence.

Plaintiff's argument with respect to the ALJ's treatment of the opinion evidence in the record also does not hold water. In the fibromyalgia questionnaire completed in April 2014, Dr. King found, in essence, that Plaintiff could not even perform the requirements of sedentary work. The ALJ accorded this opinion little weight because it was based largely on Plaintiff's subjective complaints and inconsistent with Plaintiff's history of physical examinations, treatment history, and reported daily activities. The ALJ did not err in this respect. Inasmuch as the ALJ provided sufficient reasons for discounting the credibility of Plaintiff's subjective complaints, he could also reject Dr. King's opinion, which, as he found, was apparently based entirely on Plaintiff's own complaints. It is also well settled that an ALJ may reject a treating physician's opinion if it is "inconsistent with the other substantial evidence in the case record." *Fargnoli*, 247 F.3d at 42. As the ALJ pointed out, Dr. King's opinion was inconsistent with other substantial evidence in the record. Throughout the record, Plaintiff's physical examinations were routinely unremarkable. Not only did he display full muscle strength and range of motion – which, to be sure, is expected from a person with fibromyalgia – but he also at times denied having fibromyalgia-related symptoms. What is more, he received conservative treatment. It was not until December 2013 that he received a prescription related to his fibromyalgia, and even then, he sought out a prescription. He also engaged in activities that were inconsistent with the severe restrictions found by Dr. King.

Indeed, not even Dr. King's own prior treatment notes reflect complaints of symptoms as severe as those reflected in the questionnaire completed in April 2014. For example, the last time Plaintiff saw Dr. King, in October 2013, he was "generally doing well[.]" (R. 417). Although Plaintiff reported feeling some fatigue after eating lunch and a few arthralgias, he denied paresthesia and weakness, and no mention was made of fibromyalgia in Dr. King's notes. (R.

418-19). It is also worth noting that whenever Plaintiff presented to the Urgent Care Center at the VAMC in January 2014, just a few months before Dr. King completed his questionnaire, Plaintiff denied, among other symptoms, fatigue, arthralgia, myalgia, paresthesia, and weakness – all of which one would expect to find in someone with severe fibromyalgia. (R. 459). For all of these reasons, the ALJ did not err in assigning little weight to Dr. King's opinion.

Likewise, the ALJ did not err in rejecting the VA's finding that Plaintiff's fibromyalgia was disabling. As the regulations make clear, a decision by another government agency, such as the VA, is not binding on the ALJ. *See* 20 C.F.R. § 404.1504. Nevertheless, the ALJ is "required to evaluate all the evidence in the case record that may have a bearing on [his] determination or decision of disability, including decisions by other governmental and nongovernmental agencies." SSR 06-03P, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). Accordingly, while not binding, "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." *Id.* The ALJ should, in turn, fully "explain the consideration given to these decisions . . . ." *Id.* Here, the ALJ did just that, insofar as he expressly considered the VA's finding in 2012 that Plaintiff's fibromyalgia would preclude gainful employment and provided several legally supported bases for assigning this assessment little weight.

### 2. The ALJ did not err in finding Plaintiff's PTSD, depression, and anxiety not disabling.

Plaintiff argues that the ALJ erred in finding that his PTSD is not disabling. The Court disagrees. The record contains no mention of PTSD until December 2013, when a fellow veteran referred Plaintiff to the VAMC to undergo a mental health diagnostic study with Mr. McKinstry. Up until that point, Plaintiff denied PTSD-related symptoms, and mental health screenings were consistently negative. Furthermore, it was not until April 2014 that Plaintiff received a formal

diagnosis of PTSD from a medically acceptable source, namely, Dr. Mancini. Nevertheless, the ALJ gave him the benefit of the doubt and found that his PTSD constituted a "severe" impairment that could be expected to last at least 12 months. Later, when assessing Plaintiff's RFC, the ALJ extensively reviewed Plaintiff's subjective complaints about his PTSD-related symptoms, and provided valid reasons for discounting Plaintiff's credibility with respect to these complaints and finding that Plaintiff's PTSD was not entirely disabling. As the ALJ found, there was simply a dearth of evidence to substantiate Plaintiff's bleak assessment of his own condition, primarily because he did not seek treatment until just months before the administrative hearing. Although it is understandable that Plaintiff might have been unwilling to seek treatment until December 2013 because he could not come to terms with his condition, that fact does not absolve him of the obligation to substantiate his claim with medical evidence. More than that, even though the ALJ did not fully credit Plaintiff's subjective complaints, he nonetheless limited Plaintiff "to understanding, remembering, and carrying out simple instructions and performing simple, routine tasks; is limited to no work-related contact with the public, only occasional and superficial interaction with co-workers, and no more than occasional supervision; and is limited to a low stress work environment . . . ." (R. 26). This more than accounted for the effects of his PTSD on his ability to work.

Similarly, Plaintiff contends that the ALJ erred in finding that his alleged depression and anxiety were not "severe" impairments at the second step of the sequential evaluation process. This too is a baseless contention. As with Plaintiff's PTSD, Plaintiff did not complain about symptoms of depression and anxiety until December 2013. Prior to that, depression screenings were completely negative. Moreover, although Mr. McKinstry did diagnose Plaintiff with depression and anxiety, as the ALJ pointed out, Mr. McKinstry is not an "acceptable medical

source," so his diagnosis could not establish the existence of a "medically determinable impairment." 20 C.F.R. § 404.1513. Accordingly, inasmuch as Plaintiff was never diagnosed with depression or anxiety from an "acceptable medical source," the ALJ did not err in finding that neither of these alleged conditions constituted "medically determinable impairments," let alone "severe" impairments.

### 3. The ALJ did not err in his RFC and in his analysis of the vocational evidence.

Finally, Plaintiff argues that the ALJ erred in failing to recognize several alleged limitations when assessing Plaintiff's RFC: his problems gripping and manipulating things with his hands, the limitations on sitting/standing found by Dr. King, and the off-task limitation found by Dr. King. The ALJ was not, however, required to recognize these limitations or convey them to the VE in the form of hypothetical questions if he did not find them to be credibly established. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (citation omitted) (explaining "that the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations"). In his decision, the ALJ acknowledged that Plaintiff testified about dropping things, but he found that this alleged limitation was not credibly established because "treatments notes do not contain clinical findings of problems with grip or manipulation, and the claimant had 5/5 strength in all extremities in December 2013." (R. 28). Because the ALJ provided a valid reason for rejecting this claimed impairment, he was not required to incorporate it into his RFC or convey it to the VE.[6] *See Rutherford*, 399 F.3d at 554 (noting that a limitation that an ALJ can

---

6. Even if the ALJ had found that Plaintiff was limited in the use of his hands, the result would be the same. The VE testified that, assuming Plaintiff could only occasionally grasp and finger bilaterally, he could still perform the job of surveillance system monitor, of which there are approximately 25,000 in the national economy. Courts have found that 25,000 jobs in the national economy constitutes a "significant" number. *See, e.g., Gutierrez v. Comm'r of Soc. Sec.*,

discount a limitation that is not supported by objective medical evidence). Similarly, insofar as the ALJ rejected Dr. King's opinions and provided valid explanations for doing so, he was not required to incorporate the severe limitations regarding Plaintiff's ability to sit/stand and inability to focus found by Dr. King into his RFC or convey such limitations to the VE in his hypothetical questions.

## IV. Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that he is not disabled under the Act. Therefore, the Court will **GRANT** the Motion for Summary Judgment filed by the Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff. An appropriate Order follows.

McVerry, S.J.

---

740 F.3d 519, 529 (9th Cir. 2014) (finding that 25,000 jobs "represents a significant number of jobs in several regions of the country").

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FRANKIE L. WEBB, JR.,            )
               **Plaintiff,**      )
                               )
                **v.**             )      **2:14-cv-00250-TFM**
                               )
CAROLYN W. COLVIN,           )
ACTING COMMISSIONER OF    )
SOCIAL SECURITY,             )
              **Defendant.**     )

## ORDER

**AND NOW**, this 20th day of May, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 7) is **DENIED**, the Acting Commissioner's MOTION FOR SUMMARY JUDGMENT (ECF No. 9) is **GRANTED**. The Clerk shall mark this case **CLOSED**.

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Judge

cc:    **Pamela M. Schiller, Esq.**
       Email: BSH@BSHLAW.NET

       **Christian A. Trabold, Esq.**
       Email: christian.a.trabold@usdoj.gov

       (via CM/ECF)